UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
RAUL ROSALES BONILLA,                                    :
                                                         :
                        Plaintiff,                       :
                                                         :          **OPINION & ORDER**
            -against-                                    :
                                                         :          **04-CV-4710 (DLI)**
JO ANN B. BARNHART[1],                                   :
COMMISSIONER OF SOCIAL SECURITY,                         :
                                                         :
                        Defendant.                       :
------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff Raul Rosales Bonilla ("plaintiff") filed an application for disability insurance

benefits ("DIB") under the Social Security Act on June 4, 2001. Plaintiff's application was denied

on October 26, 2001. Plaintiff testified at a hearing held before an administrative law judge ("ALJ")

on July 30, 2003. By decision dated August 20, 2003, the ALJ concluded that plaintiff was not

disabled within the meaning of the Social Security Act. On September 28, 2004, the ALJ's decision

became the defendant Commissioner of the Social Security Administration's ("Commissioner") final

decision when the Appeals Council denied plaintiff's request for review. Plaintiff brought this action

pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner denying him

DIB. Pursuant to Fed. R. Civ. P. 12(c), the Commissioner now moves for judgment on the pleadings

affirming the determination that plaintiff was not disabled because he had the residual functional

capacity to perform a significant range of medium work. Plaintiff cross-moves for judgment on the

pleadings. For the reasons stated below, both the plaintiff's and the commissioner's motion for

_____

        [1]        Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for
Commissioner Jo Anne B. Barnhart as the defendant in this action.

judgment on the pleadings are denied and the court remands this case to the Commissioner for further proceedings.

## I. Summary of Facts

*Medical Evidence*

<u>Accident, Initial Treatment and First Visit to Dr. Rosen</u>

On November 8, 2000, plaintiff suffered an on the job injury when a voting machine he was moving fell on him. (Tr. 32-33)[2]. Immediately after the accident, plaintiff was taken to the emergency room at St. Vincent's Hospital in Manhattan and was attended to by Dr. Ming Lin. (Tr. 113-122). Dr. Lin diagnosed plaintiff with a contusion to the left shoulder, gave plaintiff ibuprofen and reported that plaintiff could return to work without limitation on November 10, 2000. *Id.* The following day, November 9, 2000 plaintiff visited a chiropractor, Alan Rosen. (Tr. 137-138). In addition to "severe left shoulder pain," plaintiff reported symptoms in his neck ("cervical"), back ("dorsal") and symptoms near the small of the back and/or the back part of the pelvis between the hips ("lumbosacral"). *Id.* Plaintiff's ability to move his lower back ("dorsal lumbar range") was limited to a forty-five-degree bend ("flexion"). Plaintiff could only straighten his lower back fifteen degrees ("extension") and could only move his lower back left and right fifteen to twenty degrees. *Id.* Plaintiff's ability to move his neck ("cervical spine range") was limited to a fifteen-degree bend. He could only straighten his neck twenty degrees, move his neck left and right twenty degrees and rotate his neck twenty degrees to the right and twenty degrees to the left. *Id.* Plaintiff also reported pain in his upper and lower spine when Dr. Rosen touched it ("palpation") and tapped it ("percussion").

[2] References to "Tr." are to the Administrative Record filed with this court on February 28, 2005.

*Id.* Dr. Rosen also preformed tests on plaintiff's neck and opined that plaintiff may have "cervical spine derangement with radiculopic features." *Id.* Dr. Rosen further determined that plaintiff's lower back suffered from irritation of the joints ("lumbosacral facet syndrome"), that there was a disturbance in the usual order of plaintiff's upper and lower spine, and that plaintiff suffered from severe involuntary muscle contractions on the left and the right of the upper and lower parts of plaintiff's spine ("severe bilateral involuntary paravertebral muscle spasms of the cervical and lumbosacral spine"). Dr. Rosen recommended chiropractic care and physical therapy. To rule out that plaintiff was suffering from a disorder of the spinal nerve roots ("radiculopathy"), Dr. Rosen recommended that plaintiff visit a neurologist. *Id.* To rule out an bone injury to the left shoulder ("internal derangement of the left shoulder"), Dr. Rosen recommended that plaintiff visit an orthopedic surgeon. *Id.* Finally, Dr. Rosen noted that defendant had difficulty walking, accessing the examination table and concluded that Plaintiff's injuries were causally related to the work place accident. *Id.*

Plaintiff continued treatment with Dr. Rosen on a semi-monthly basis and, on May 21, 2001, Dr. Rosen issued a brief report to "justify the necessity of [treatment]." Dr. Rosen's evaluation of plaintiff on May 21, 2001, was similar to his evaluation in November 2000, except that plaintiff was now able to bend his lower back fifty degrees, straighten his lower back to thirty degrees and turn his lower back laterally left and right to fifteen degrees. Tr. 135. As he did in November 2000, plaintiff reported pain in his lower spinal cord and spasms in his lower back. *Id.* Plaintiff also had a decrease in the normal forward curvature of the spine in the lower back ("a decrease in the normal lumbar lordosis"). *Id.* Dr. Rosen also found that plaintiff's upper back continued to be deranged and the possible disorder of the spinal nerve roots ("radiculopic features") appeared to be getting worse. (Tr.

136). Dr. Rosen again recommended that plaintiff continue to obtain chiropractic treatment. *Id.*

<u>Dr. Fleischer's November 15, 2000 and December 7, 2000 Examinations</u>

Taking Dr. Rosen's advice, on November 15, 2000, plaintiff was examined by Dr. Noel Fleischer, a neurologist. Plaintiff complained to Dr. Fleischer of "headaches, which are associated with dizziness and nausea." (Tr. 126). Plaintiff also had "neck, mid and lower back pain radiation toward the left arm, with numbness, in the left leg." *Id.* Consistent with Dr. Rosen's diagnoses, Dr. Fleischer found that plaintiff had involuntary muscle contractions in his back, tenderness and an impaired range of motions (lateral, extension and rotation). (Tr. 127). Plaintiff's deep tendon reflexes ("DTR"), which can be tested by eliciting involuntary muscular responses by tapping a rubber hammer against certain tendon, were normal ("+2") except for the left ankle, which was trace ("+1"). *Id.* Plaintiff's motor strength was normal ("5/5") except for the left hand grip, muscles in the calf of the left leg ("tibialis anterior") and the left muscle covering the joint of the shoulder ("deltoid") which tested "5-/5," indicating that movement was possible when there was some resistance by the examiner, but was not quite normal. *Id.* Pinprick tests indicted a "diminished" response in parts of plaintiff's spine, but position and vibration tests showed no anomalies. *Id.* Neither the finger-nose test, which tests coordination, nor the Romberg test, which tests proprioceptors (sensory receptors in muscles, tendons, joints and the inner ear which detect motion) were abnormal. *Id.* Both of plaintiff's legs could be raised to forty degrees, and other tests were all also normal. *Id.* Dr. Fleischer's "clinical impression" was that plaintiff suffered radiculopathy in both the neck and the lower back and that plaintiff also suffered from myofacial pain syndrome, a painful musculoskeletal condition. (Tr. 127). The prognosis was for continued chiropractic treatments and taking simple painkillers ("analgesic") and that Magnetic Resonance Imaging ("MRI") and Electromyography

("EMG") examinations may be necessary. *Id.* Dr. Fleischer concluded that the plaintiff's prognosis was "guarded." *Id.*

Plaintiff returned to Dr. Fleischer on December 7, 2000, again complaining of "headaches, dizziness, neck and lower back pain with radiation towards the left arm and left leg." (Tr. 124). Apparently, the medication he was taking for his headaches, Fioricet, was not working. *Id.* Dr. Fleischer's examination on December 7 was almost identical to the one preformed on November 15, except that on December 7, plaintiff had "positive straight leg raising." Dr. Fleischer prescribed Celebrex, told plaintiff to continue to obtain chiropractic care from Dr. Rosen, asked plaintiff to return in four to six weeks and again requested authorization for MRI and EMG scanning. *Id.*

### CAT Scan on January 25, 2001

On January 25, 2001, plaintiff underwent a Computed Tomography examination ("CAT Scan") at L.I. Radiology Associates, P.C. The CAT Scan showed a herniating in plaintiff's upper spine at C4-5 causing the disc to make contact with the spinal cord. (Tr. 132). Likewise, plaintiff's spine at C5-6 had a small herniating, but there was no contact with the spinal cord. *Id.* The evaluation of the plaintiff's spine at C7-T1 was unreliable. *Id.* After reviewing the CAT Scan, Dr. James R. McCleavey's impression was that defendant had a herniated disc at C4-5 and a " 2MM central disc C5-6." *Id.* Dr. McCleavey also found that Dr. Rosen's diagnoses that some vertebrae had lost their normal position and/or motion in relation to neighboring vertebrae ("vertebral subluxation complex") was correct. *Id.* The CAT Scan of plaintiff's lower back indicated degenerative narrowing of the facet joints at L4-5 and L5-S1 and an enlargement of the joints in the spine which prevented neurons from passing through an opening in the spinal column, known as the foramen ("crowding and narrowing of the neural foraminal lateral recesses"). (Tr. 133). The other

anomalies discovered by the CAT Scan were a lack of matter and water ("desiccation and vacuum phenomena") at L5-S and a bulge rubbing against the outside of the of the disc at L4-5 ("annulus bulge . . . effacing the ventral surface of the thecal sac") which has the effect of "crowding lateral recesses." *Id.* Dr. McCleavey's impression was that plaintiff suffered from a bulging disc in his lower back which was causing a defect in the outside of the outermost of the three coverings of the spinal cord ("extradural defect"), that some of plaintiff's discs were dehydrated, that plaintiff suffered from facet arthropathy (narrowing of the opening in the spinal column) in L4-5 and L5-S1 discs, and that plaintiff suffered from slight bulges outside the discs, at each level. (Tr. 134). As with the CAT Scan of plaintiff's upper back, Dr. McCleavey concluded that some vertebrae had lost their normal position and/or motion in relation to neighboring vertebrae ("vertebral subluxation complex"), and that Dr. Rosen's diagnoses were correct.

Treatment By Dr. Laxmidhar Diwan

Dr. Rosen next referred plaintiff to an orthopedic surgeon, Dr. Laxmidhar Diwan at Queens Arthroscopy & Sports Medicine. (Tr. 155). On March 14, 2001, plaintiff visited Dr. Diwan and complained of "pain, swelling and limitation of motion involving the left shoulder, right ring finger and both knees." *Id.* Plaintiff told Dr. Diwan that his right knee hurt more than his left knee, and the pain prevented him from climbing stairs, bending, kneeling, squatting or walking long distances. Plaintiff reported pain in both his right and left knees, although the pain in the left knee was not on the side of the knee ("lateral") but only in the front and middle ("medial"). (Tr. 156). Plaintiff also told Dr. Diwan that he had limited motion in his left shoulder, causing pain to the outside and top of the shoulder which prevented him from carrying anything heavy, prevented him from conducting overhead activities and caused problems with sleeping. *Id.* Plaintiff also complained of pain in his

right finger, and of being unable to lift any heavy weight. *Id.* Dr. Diwan's examination revealed no deformity in the right knee, but a moderate amount of fluid ("effusion") and some tenderness in the area. (Tr. 157). Plaintiff's joint at the top of plaintiff's right knee cap ("patellofemoral area") was tender and there were cracking sounds in plaintiff's right knee ("crepitations"). *Id.* The "patellofemoral grind test" indicated that plaintiff's right knee joint was the cause of the pain. *Id.* Both plaintiff's right medial and lateral collateral ligament ("MCL" and "LCL") were loose ("medial/lateral collateral ligament laxity"). *Id.* There was also evidence of a tear in the plaintiff's cartilage near the right knee ("meniscus tear") and of the softening and degeneration of the cartilage in the right knee ("chondromalacia"). *Id.* Plaintiff was only able to bend his right knee to ninety degrees; anything beyond was painful. Plaintiff was weak in the right quadriceps and calf muscles. *Id.* There was no evidence of fracture or dislocation or "any other bony pathology" in the right knee. (Tr. 158). The left knee was similar but there was only a minimal amount of fluid and there was no looseness of the of the MCL and LCL. *Id.* The left knee was able to bend to 100 degrees, but anything further was painful . *Id.* In the left knee, like the right knee, there was no evidence of any fracture or dislocation.

Dr. Diwan next examined plaintiff's shoulder and found that it had a normal contour. Upon examination, plaintiff reported pain in the front and outside of the shoulder and there were cracking sounds ("crepitations"). *Id.* Dr. Diwan found tenderness around plaintiff's shoulder and under plaintiff's shoulder blade ("subacromial space"). Plaintiff reported pain in the back of the shoulder when his arm was flexed past 90 degrees. Plaintiff's right muscle covering the joint of the shoulder was unused ("wasting of the deltoid"). *Id.* The plaintiff was able to bend his shoulder to 160 degrees and was able to move his shoulder away from his body to 160 degrees ("abduction"). Plaintiff was

weak in his shoulder rotations and the extremes of all motions were painful. *Id.* However, there was no evidence of fracture or dislocation or any other bony pathology in plaintiff's shoulder. (Tr. 159).

With respect to plaintiff's right index finger, although there was swelling in the area of the middle joint ("PIP joint") and a limited range of motions, there was no evidence of any fracture or other bony pathology. *Id.*

Dr. Diwan's impression was that plaintiff suffered from chronic knee problems resulting from degenerative wear and tear or trauma ("internal derangement involving both knees"). Dr. Diwan also wished to rule out a rotator cuff tear involving the left shoulder and a fracture of the right ring finger. *Id.* Plaintiff was advised to continue treatment with Dr. Rosen and, according to Dr. Diwan, plaintiff "remains totally disabled." *Id.*

On April 15, 2002, Dr. Diwan completed a "Multi Impairments Questionnaire." (Tr. 147-154). In the questionnaire, Dr. Diwan reported that he has been treating plaintiff every six weeks beginning March 14, 2001 with the last treatment being on March 20, 2002. (Tr. 147). Based on his treatment, Dr. Diwan diagnosed plaintiff with "internal derangement of the knees" and a "rotator cuff tear left shoulder." *Id.* Dr. Diwan lists his clinical findings which support the diagnosis: moderate effusion in both knees, tenderness in both knees, crepitations in both knees, limited motion and positive impingement in both knees. *Id.* The clinical findings that allowed Dr. Diwan to diagnose that plaintiff had a rotator cup injury in his left shoulder were impingement signs, crepitations and limited motion. *Id.* There were no laboratory or diagnostic tests supporting Dr. Diwan's diagnosis, although Dr. Diwan wished to take an MRI. (Tr. 148). Dr. Diwan further explained that plaintiff had pain in his knees and left shoulder and that plaintiff's pain was aggravated by sitting, standing, bending, lifting and by excessive walking. (Tr. 149). Dr. Diwan rated plaintiff's pain and fatigue as

8

an eight out of a possible ten and stated that medication was not able to relieve the pain. *Id.* In Dr. Diwan's opinion, plaintiff could sit or stand for less than an hour out of an eight-hour work day, and would have to move around every fifteen minutes for fifteen minutes at a time. (Tr. 149-150). Dr. Diwan found that plaintiff was unable to lift or carry more than five pounds, do repetitive activities, do overhead activities, keep his neck in a constant position, concentrate due to pain and tolerate even "low stress." *Id.* Plaintiff's symptoms were expected to last more than twelve months, but would produce good days and bad days. (Tr. 153). According to Dr. Diwan, if plaintiff were to return to work, he would need to be close to a rest room, would miss work more than three times a month and would need to avoid wetness, temperature extremes, pushing, pulling, noise, humidity, kneeling, fumes, dust, bending, gases, heights and stooping. *Id.*

Dr. Diwan's next report was generated after a "follow-up" visit on December 23, 2002, several days before plaintiff's last insured date. (Tr. 189). Plaintiff continued to complain of pain in the lower back, left shoulder and both knees. *Id.* As with Dr. Diwan's other physical examinations, Dr. Diwan found that there was tenderness in the front and back of plaintiff's shoulder and below the shoulder blade. *Id.* Plaintiff's deltoid muscle was wasting away. There was impingement and the plaintiff's ability to rotate his shoulder and bend his shoulder was limited to seventy degrees, with some pain. *Id.* Dr. Diwan's examination of plaintiff's knees revealed fluid, crepitations, tenderness over the knee cap and on the side of knee ("patellofemoral area"). (Tr. 190). All other tests were negative, and there was no looseness of the MCL or LCL. *Id.* Plaintiff was able to bend his knee 90 degrees but was weak in the quadriceps and calf muscles. *Id.* Dr. Diwan, desiring to rule out a rotator cuff tear involving the left shoulder and to rule out an internal derangement involving both knees, requested an MRI and authorization of an arthroscopy to examine

9

plaintiff's joints. In numerous forms submitted to the New York State worker's compensation board between January 7, 2002, and June 20, 2003, Dr. Diwan stated that plaintiff was "totally disabled." (Tr. 191-200; 220-223; 269-279).

### July 3, 2001 Visit to Elmhurst Hospital

On July 3, 2001, plaintiff presented himself at the neurologic department of Elmhurst Hospital Center. (Tr. 141). The doctor's notes for the visit state that plaintiff had "no frank defects" and plaintiff's gait was normal, he had no signs of degeneration, decline ("atrophy") and his mind was clear and he was aware. *Id.*

### July 16, 2001 Examination by Dr. Khattak

On July 16, 2001, plaintiff visited an orthopedic surgeon retained by the Commissioner, Dr. Mohammad Khattak. (Tr. 145). As in his prior doctor's visit, plaintiff complained of pain in his neck, lower back, left shoulder and knee joints. *Id.* Plaintiff stated that he was unable to sit or walk for long periods of time, could not bend and could not lift. *Id.* Plaintiff also reported that he was able to care for himself, although his wife does household chores and shopping. *Id.* Plaintiff stated that he used public transportation. *Id.* Dr. Khattak noted that plaintiff did not exhibit any signs of acute distress, moved around without any assistance ("ambulating"), had a steady gait, stood up and sat down normally and got on and off the examination table with little problem. *Id.* In contrast to Dr. Rosen's findings, Dr. Khattak found that plaintiff's upper back was normal, and there was no muscle spasms, or tenderness. *Id.* Plaintiff was able to bend his neck forty-five degrees, was able to straighten his neck forty-five degrees and was able to move his neck from side to side twenty degrees. His DTRs were all normal (+2). *Id.* With respect to plaintiff's shoulders, Dr. Khattak found the range of motion to be normal, found that there was no swelling, fluids or instability, and that there

was no decaying of the muscles from lack of use ("atrophy").  *Id.*  Plaintiff's lower back exhibited

a normal curvature, did not have muscles spasms nor tenderness.  *Id.*  Plaintiff was able to raise both

legs straight up in the air, bend forward ninety degrees and bend toward his left and right.  *Id.*  Dr.

Khattak found that plaintiff's prognosis was good and that he only suffered from "soft tissue injuries."

(Tr 146).  In the end, plaintiff was found to have "no limitation in bending, sitting, standing, walking,

lifting, carrying or reaching."  *Id.*

Other Medical Examinations Before the Date of Last Insured

On February 25, 2002, plaintiff presented himself to Metropolitan Hospital Center's

Cystoscopy Suite.  The visit was apparently unrelated to the accident on November 8, 2000.  The staff

of the Cystoscopy Suite asked plaintiff to complete a "Patient Assessment Form." (Tr. 252).  On the

form, plaintiff stated that he had no pain.  (Tr. 253).  On March 7, 2002, plaintiff presented himself

again to Metropolitan Hospital Center complaining of a mass on his back.  (Tr. 235).  Surgery took

place on April 3, 2002.  In an "Initial Pain Assessment Form" completed as part of the operation,

plaintiff stated that he had continuous pain in his left shoulder and lower back.[3]  (Tr. 243).   On

August 22, 2002, plaintiff admitted himself into Metropolitan Hospital Center complaining of

abdominal cramps, with no relation to plaintiff's claimed injuries from the November 8, 2002

accident.  (Tr. 230-233; 256-259).

Medical Treatment Since Date of Last Insured

Since his date of last insured, plaintiff has obtained treatment for osteoarthritis, a joint disease

---

[3]        For reasons that are unclear, the records from Metropolitan Hospital Center include
two "Initial Pain Assessment Forms," both completed on April 3, 2002.  One of them states that
defendant does not have any pain while the other states that the defendant has severe, continuous
pain in his lower back and his right shoulder. (Tr. 241-244).

caused by the breakdown and loss of cartilage in the knee. (Tr. 280). On May 14, 2004, Dr. Rosen completed a "spinal impairment questionnaire." *Id.* On the questionnaire, Dr. Rosen stated that plaintiff suffered from a "cervical disc herniating," a "brachial neuritis radiculitis,"as well as "lumbar radicular syndrome" which gave plaintiff "permanent total disability." *Id.* Muscle spasms, tenderness as well as a limited range of motion in the lower back were all noted. (Tr. 287). Dr. Rosen reported that plaintiff had "constant strong pain" in his lower back, radiating into his legs, along with muscle spasms. (Tr. 288). According to Dr. Rosen, plaintiff's condition had improved slightly because plaintiff could sit for three hours and stand for one hour during an eight-hour work day. (Tr. 289). Plaintiff's pain was now frequent, but not constant. (Tr. 290). He was unable to carry or lift more than five pounds and was restricted in his ability to work. *Id.* On the May 14, 2004, survey, and on a form submitted to the New York State Worker's Compensation Board that same day, Dr. Rosen concluded that plaintiff remained totally disabled. (Tr. 292-293).

*Non-Medical Evidence*

The non-medical evidence consists of testimony provided by the plaintiff at a hearing before the ALJ on July 30, 2003, during which plaintiff was represented by counsel. (Tr. 23-46). Plaintiff testified as to his prior work experience as a kitchen helper, cook, pressman and airport cleaner and the physical demands of each. (Tr. 33-34, 76; 84-85; 94). According to the testimony, plaintiff served as a mover from May of 2000 until his injury in November of 2000. (Tr. 85). In addressing his injuries from the November 8, 2000, accident, plaintiff stated that he sustained injuries to his left shoulder, left side of his neck, both his knees and to his back. (Tr. 36). He stated that, at the time of the hearing (after the plaintiff's last insured date), he was unable to bend his back, suffered headaches and pain in the right index finger and lower back and had no strength in his left shoulder. (Tr. 36, 38,

39, 40).  Plaintiff further stated that his knee pain caused him to walk slowly, and that he could only walk three to four blocks at a time, sit for about twenty five minutes and could not lift anything with his left arm, but that he could lift ten to twenty pounds with his right.  (Tr. 37; 40-41; 44).  Plaintiff further testified that his companion cooks, cleans and does the laundry and that he spends his days watching television, reading newspaper, and taking short walks.  (Tr. 31,41, 43).  Plaintiff uses public transportation and traveled to Honduras in September of 2002.  (Tr. 41-42).

*The ALJ's Decision*

In a written decision dated August 20, 2003, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act and, therefore, was not entitled to DIB.  The ALJ utilized the five-step sequential analysis set forth in 20 C.F.R. § 404.1520 to reach his conclusion. The ALJ resolved step one in plaintiff's favor because plaintiff had not performed substantial gainful activity during the relevant period.  (Tr. 15).  At step two, the ALJ found that plaintiff's impairments – the injuries to his left shoulder, lower and upper back, spine and right index finger – were "severe" as defined by the Social Security Act.  (Tr. 17).  The ALJ noted that the plaintiff's impairments did not meet or equal the requirements of any listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 17).  Because the ALJ found that plaintiff's impairments, although severe, do not meet or equal any listed impairments, the ALJ went on to the fourth step of the inquiry and analyzed whether plaintiff was unable to perform past relevant work.  *Id.*  To make this determination, the ALJ examined plaintiff's residual functional capacity – what limitations are imposed on the plaintiff as a result of his impairments, and the plaintiff's ability to perform past relevant work notwithstanding the impairments.  *Id.*  Here, the ALJ found that plaintiff was not disabled because, even with his impairments, he was able to perform medium work, which includes his past relevant work as a

kitchen helper, cook, pressman and airport cleaner. (Tr. 18). The ALJ also considered the possibility that plaintiff's residual functional capacity would not allow plaintiff to perform his past relevant work. *Id.* This did not affect the ALJ's findings because the Commissioner meet her burden to demonstrate that the plaintiff's residual functional capacity allows him to perform other jobs that are present in significant numbers in the national economy. *Id.* In making its decision that the plaintiff's residual functional capacity both allowed him to perform his past work, and perform jobs present in significant numbers in the national economy, the ALJ discounted the opinions of Dr. Rosen and Dr. Diwan that plaintiff was "totally disabled." *Id.* Instead, the ALJ agreed with Dr. Khattak that plaintiff was able to perform his prior work, or work that was present in significant numbers in the national economy, despite his impairments. *Id.* Moreover, the ALJ believed that defendant's assertions of impairment were not entirely credible. (Tr. 19).

## II.     Discussion

*Standard of Review*

In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed.

126 (1938)). The reviewing court is required to examine the entire record to determine whether the findings are supported by substantial evidence, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983). In determining whether the ALJ's determination is supported by substantial evidence, the court "'must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such finding, including, any contradictory evidence and evidence from which conflicting inferences may be drawn.'" *Beckles v. Barnhart*, 340 F. Supp. 2d 285, 287 (E.D.N.Y. 2004) (quoting *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991)). The court also must "keep[ ] in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998). Indeed, in evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

After its review, the district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate where "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases).

*Standards Governing Evaluation of Disability Claims by ALJ*

An individual is "disabled" under the Social Security Act where there is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof of showing disability by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5); *see also Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

Pursuant to 20 C.F.R. § 404.1520, there is a five-step process whereby the ALJ determines disability under the Social Security Act. If at any step, the ALJ makes a finding that the claimant is either disabled or not disabled, the inquiry ends there. At the first step, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a severe impairment, without reference to age, education, or work experience. To be considered disabled, the claimant must have an impairment, or combination of impairments, which significantly limits his or her physical or mental ability to do basic work activities, satisfying the durational requirement in § 404.1509. 20 C.F.R. § 404.1520 (c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[4]  *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ then makes a finding about the claimant's "residual functional capacity" in steps four and five. 20 C.F.R. § 404.1520(e). The

---

[4] 20 C.F.R. pt. 404, subpt. P, app. 1.

"residual functional capacity" is "the most [the claimant] can still do despite . . . limitations." 20 C.F.R. § 404.1545(a). The ALJ considers all of the claimant's impairments and symptoms, including pain, that may cause physical or mental limitations. *Id*. In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work which exists in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to show that the claimant could perform the other work. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

*Resolution of Conflicting Medical Evidence*

The ALJ rejected plaintiff's claim on the grounds that plaintiff retains the residual functional capacity to "return to any of his past relevant work" and also because the plaintiff's residual functional capacity allows him to work in jobs present in significant numbers in the national economy (Tr. 18-19). In coming to this conclusion, the ALJ relied primarily on the opinion of Dr. Khattak who found that plaintiff's impairments were minor. The ALJ did not give controlling or any weight to plaintiff's treating physicians. Thus, in this case, whether or not the ALJ's findings with respect to plaintiff's residual functional capacity are based on substantial evidence depends upon the application of the "treating physician rule." The rule states "the medical opinion of treating physicians, as to the severity of the impairment, is given controlling weight 'only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial

evidence.'" *Schisler v. Sullivan*, 3 F.3d 563, 567 (2nd Cir. 1993) (*citing* 20 C.F.R. 404.1527(d)).[5]

The ALJ's duty is to assure that the treating physician's report is well- supported but "the ALJ cannot arbitrarily substitute his own judgment for a competent medical opinion." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

Dr. Khattak's evaluation of the plaintiff's medical condition prior to the date of last insured is diametrically opposed to the evaluation of Dr. Diwan and Dr. Rosen, plaintiff's treating physicians. Dr. Rosen found that Plaintiff's ability to move his neck and lower back lower back was limited and that plaintiff had pain in his neck and lower spine. Dr. Rosen's diagnosis was that plaintiff's neck may suffer from a "cervical spine derangement with radiculopic features" and plaintiff's lower back suffered from irritation of the joints ("lumbosacral facet syndrome"). In addition, Dr. Rosen found that there was a disturbance in the usual order of plaintiff's upper and lower spine, and that plaintiff suffered from severe involuntary muscle contractions on the left and the right of his neck and lower parts of his spine ("severe bilateral involuntary paravertebral muscle spasms of the cervical and lumbosacral spine"). Dr. Rosen also noted that defendant had difficulty walking and accessing the examination table. Plaintiff visited Dr. Rosen on a regular basis and Dr. Rosen submitted numerous forms to the New York State Workers Compensation Board stating that plaintiff was totally disabled. Plaintiff's other treating doctor, Dr. Diwan, an orthopedic surgeon, addressed the pain in plaintiff's knees and shoulder. Dr. Diwan found that plaintiff suffered from chronic knee problems resulting from degenerative wear and tear or trauma ("internal derangement involving both knees"). Dr. Diwan also

---

[5]     20 C.F.R. § 404.1527(d)(2) states in relevant part: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."

wanted to rule out a rotator cuff tear involving the left shoulder and a fracture of the right ring finger. *Id.* Plaintiff was advised to continue treatment with Dr. Rosen and, according to Dr. Diwan, plaintiff "remains totally disabled." Dr. Diwan treated plaintiff every six weeks. (Tr. 147).

On the other hand, Dr. Khattak found that plaintiff's upper back was normal: he found no muscle spasms, tenderness, or movement limitations. According to Dr. Khattak, Plaintiff's lower back exhibited a normal curvature, no muscles spasms and no tenderness. Dr. Khattak found that plaintiff's DTRs were all normal (+2). With respect to plaintiff's shoulders, Dr. Khattak found the range of motion to be normal, found that there was no swelling, fluids or instability, and that there was no decaying of the muscles from lack of use. Plaintiff was able to raise both legs straight up in the air, was able to bend forward ninety degrees and was able to bend toward his left and right. There is no indication that Dr. Khattak examined plaintiff's knees. Dr. Khattak found that plaintiff's prognosis was good and that he only suffered from "soft tissue injuries" and that Plaintiff had "no limitation in bending, sitting, standing, walking, lifting, carrying or reaching." It is important to note that Dr. Khattak only examined plaintiff once and did not order follow up tests, such as an EMG or MRI, to verify his findings.

The ALJ chose to give more weight to Dr. Khattak's opinion and less to the opinion of plaintiff's treating physicians. The ALJ's reason for this was that "a case cannot be decided by relying on medical opinions without some objective support for those opinions. Controlling weight may only be given in appropriate circumstances, and may not be given at all to a treating source opinion unless it is well supported by medically acceptable clinical and laboratory diagnostic techniques." (Tr. 18).

The ALJ's decision is not based on substantial evidence and is incorrect as a matter of law

because, as a matter of law, if the ALJ determines that the opinion of the treating physician as to the nature and severity of the impairment is not to be given controlling weight, the ALJ must apply various factors to decide how much weight to give the opinion. *See Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *Clark*, 143 F.3d at 118. Those factors include: (I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Clark*, 143 F.3d at 118. Applying those factors, when the ALJ chooses not to give the treating physician's opinion controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (*quoting* C.F.R. §§§§ 404.1527(d)(2); 416.927(d)(2)). Here, without going through these factors, the ALJ stated that "the treating source opinion in this case is not given controlling, or even great, weight." (Tr. 18). The failure to conduct the proper evaluation before deciding not to give controlling weight or great weight to plaintiff's treating doctor's opinion requires remand. *Rosato v. Barnhart*, 352 F. Supp. 2d 386, 396 (E.D.N.Y. 2005) (remand required where ALJ failed to take into account opinion of a treating physician who was the first to diagnose plaintiff and who referred plaintiff to specialist); *see also Pogozelski v. Barnhart*, 03 CV 2914, 2004 WL 1146059 *12 (E.D.N.Y. May 19, 2004) ("the opinion of a treating physician, should have been accorded controlling weight, or if not, the ALJ was still required to apply the factors specified in the regulations concerning treating physicians. . . to determine the degree of weight it deserved. . .failure to do [so] requires remand). The ALJ clearly failed to make the required showings before deciding to afford little weight to Dr. Diwan's opinion.

With respect to Dr. Rosen, the ALJ apparently did not afford his opinion any weight whatsoever.[6] The Commissioner contends that the failure to take into account the opinion of Dr. Rosen is not an error because Dr. Rosen is a chiropractor, and chiropractors are not listed in section 404.1513(a), which lists five categories of "acceptable medical sources." However, chiropractors are specifically listed in another section under "other sources" whose "information ... may also help us to understand how your impairment affects your ability to work." *Id*. § 404.1513(d)(1).[7] Reconciling these two provisions, the Second Circuit has held that a chiropractor's opinion is neither a medical opinion nor an "acceptable medical source" for purposes of the treating physician rule. *See Diaz v. Shalala*, 59 F.3d 307, 313-314 (2d Cir. 1995). However, the ALJ has "the discretion to determine the appropriate weight to accord the chiropractor's opinion based on all the evidence before him" *Id*. at 314. Thus, reports from chiropractors may assist an ALJ in determining whether a claimant is disabled, and thus should be not discounted arbitrarily. *See id*. at 312 n. 4 ("our decision today ... does not prevent the secretary from according a chiropractor's opinion significant weight in appropriate circumstances."). By failing to give any weight to Dr. Rosen's opinion, the ALJ has ignored evidence that is potentially favorable to plaintiff and the unreasoned rejection of evidence favorable to plaintiff is unacceptable. *See Fiorello v. Heckler*, 725 F.2d 174, 175-76 (2d Cir. 1983). On remand, the ALJ

---

[6]    The applicable regulations state that, "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s)...." 20 C.F.R. § 404.1527(a)(2).

[7]    This is significant because according to the Regulations, "Regardless of its source, [the SSA] will evaluate every medical opinion [it] receives." 20 C.F.R. § 416.927(d). Thus, because opinions by chiropractor are not medical opinions, but rather other opinions, the ALJ is not required to take them into account.

should determine what weight, if any to give Dr. Rosen's opinions.[8]

The court further finds that the ALJ did not properly consider the medical opinions of Dr. Fleischer, a neurologist. Dr. Fleischer's "clinical impressions" were that plaintiff had suffered radiculopathy in both the neck and the lower back and that plaintiff also suffered from myofacial pain syndrome, a painful musculoskeletal condition. Although Dr. Fleischer did not state that plaintiff was totally disabled, he concluded that the plaintiff's prognosis was "guarded." Again, the ALJ is silent as to what weight was given to Dr. Fleischer's opinion, and, if less than controlling weight was given, no reason was articulated in his decision. *See Hinds v. Barnhart,* 03 CV 6509, 2005 WL 1342766, *8-9 (E.D.N.Y. April 2, 2005) (remand appropriate where the ALJ discounted the reports of plaintiff's chiropractor and neither reported or commented upon the opinions of two treating physicians).

There is evidence in the record that tends to contradict the opinions of Drs. Diwan, Fleischer and Rosen.[9] However, the ALJ's findings are not supported by substantial evidence because, in light

---

[8]    Dr. Rosen's and Dr. Khattak's findings were inconsistent and, if medical assessments are inconsistent, it is the ALJ's duty to resolve those conflicts, not the court's. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("genuine conflicts in the medical evidence are for the Commissioner to resolve."). It should be noted however, that Dr. Rosen's diagnosis was supported by the July 25, 2001 CAT Scan as well as frequent examinations and reviews of the reports by the treating medical specialists, in contrast to Dr. Khattak's conclusion, which was based on a cursory examination, at best.

[9]    For example, X-rays were negative for bony pathology and the CAT Scan did not reveal herniating in plaintiff's lower back, but did reveal one in his upper back. Plaintiff's July 3, 2001 visit to Elmhurst Hospital Center's neurological department resulted in a finding that plaintiff had no frank defects. In the February 25, 2002 "Patient Assessment Form" from the Metropolitan Hospital Center, plaintiff apparently stated that he had no pain. (Tr. 253). The two "Initial Pain Assessment Forms" submitted as part of plaintiff's April 3, 2002, operation at Metropolitan Hospital Center, both signed by plaintiff, were contradictory in that, on one form, Plaintiff stated he was in pain and, on the other, he stated he was not (Tr. 241-244).

of the existence of conflicting evidence, the ALJ did not attempt to clarify the treating sources'

opinions. An ALJ is required to clarify a treating source's opinion as part of the ALJ's affirmative

obligation to develop a claimant's medical history. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d

Cir.1999) (" 'if an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an

affirmative duty to seek out more information from the treating physician and to develop the

administrative record accordingly" (quoting *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y.

1998)); *see also Foster v. Callahan*, 96 CV 1858, 1998 WL 106231, at * 5 (N.D.N.Y. March 3, 1998)

("an ALJ should make every reasonable effort to obtain treating source evidence, and if the treating

source provides an incomplete report, the ALJ must request the necessary additional information from

the treating source." (emphasis in original, internal quotations omitted)); 20 C.F.R. § 404.1512(e)(1)

(providing that the SSA "will seek additional evidence or clarification from [a] medical source when

the report from [the] medical source contains a conflict or ambiguity that must be resolved."). The

failure of the ALJ to clarify the record, especially in light of the fact that the ALJ afforded no weight

to plaintiff's treating physicians purportedly because their opinions were not properly supported,

requires remand.

   Furthermore, the court finds that the failure of the ALJ to take plaintiff's subjective allegations

of limited mobility, pain and discomfort into account requires remand. The ALJ stated only that he

has "taken into account the claimant's assertions, statements and hearing testimony concerning

symptoms and functional limitation [but] such claims must find objective support in the record." (Tr.

18). The fact that the ALJ was unable to find objective support for plaintiff's subjective feelings of

pain is of no moment because "objective findings are not required in order to find that an applicant

is disabled." *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003). Moreover, as a matter

of law, the ALJ is required to consider various factors, including the claimant's daily activities, the frequency and intensity of pain, the type, dosage, effectiveness, and side effects of medication, and other treatment that relieves pain in deciding plaintiff's residual functional capacity. *See* 20 C.F.R. §§ 416.929(c)(3). Thus, the Second Circuit has stated that "a patient's report of complaints, or history, is an essential diagnostic tool." *Green-Younger*, 335 F.3d at 107 (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997)). Here, the non-medical evidence of plaintiff's pain and mobility limitations were dismissed by the ALJ as "disproportionate to the record." (Tr. 18). The ALJ justified his findings by noting that x-rays did not indicate any bony pathology and the CAT scan did not indicate a lumbar disc herniating, although it did indicate a cervical disc herniaition. The ALJ also noted that plaintiff "is independent in daily activities and self care." (Tr. 19). However, the fact that plaintiff can take care of himself is of limited probative value because the Second Circuit has stated on numerous occasions that a claimant "need not be an invalid to be found disabled" under the Social Security Act. *Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir. 1988) (quoting *Murdaugh v. Sec'y of Health and Human Servs.,* 837 F.2d 99, 102 (2d Cir. 1988) (claimant who "waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table" nevertheless is disabled because he could not perform sedentary work)). On remand, the ALJ should, therefore, take into account evidence in the record regarding plaintiff's subjective description of his pain, and functional limitations along with his treating physicians' opinions.

*Disposition*

After reviewing the Commissioner's determination, a reviewing court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.

§ 405(g) (2004). In determining whether to remand, a key factor is whether the administrative record contains gaps so that further development of the evidence is appropriate. *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir.2004). Remand is inappropriate if the court has no reason to believe a more complete record might support the Commissioner's decision. *Id.* In this case, the court believes that a more complete record may support the Commissioner's decision by allowing the ALJ to assess the conflicting opinions of plaintiff's treating physicians and Dr. Khattak and better explain why the opinions of plaintiff's treating physicians were not given controlling weight. In addition, the ALJ may wish to explain what weight was given to Dr. Rosen's opinions, and if no weight is given (even as a secondary non-medical opinion), set forth his reasons. The ALJ shall also more fully assess the credibility of plaintiff's's subjective complaints of pain and mobility impairment. Any medical information that the ALJ deems to be missing should be developed on remand. *See Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999); S*ee also, Foster v. Callahan,* No. 96- 1858, U.S. Dist. LEXIS 22099, at *12-13 (N.D.N.Y. Mar. 3, 1998) ("an ALJ should make every reasonable effort to obtain treating source evidence, and if the treating source provides an incomplete report, the ALJ must request the necessary additional information from the treating source.") (internal citations omitted).

## III.   Conclusion

The Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion. *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975). Consistent with that view, "courts have not hesitated to remand for the taking of additional evidence, on good cause shown, where relevant, probative and available evidence was either not before the Secretary or was not explicitly weighed and considered by him, although such consideration was necessary to a just determination of a claimant's application." *Id.*

Accordingly, this case is remanded to the Commissioner for further evidentiary proceedings consistent with this Memorandum and Order, pursuant to the fourth sentence of 42 U.S.C. § 405(g). To prevent delay in the processing of plaintiff's case, further proceedings before the ALJ must be completed within sixty days of the issuance of the order, i.e. by November 19, 2007; if plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty days of plaintiff's appeal, if any. *See Butts v. Barnhart*, 388 F.3d 377, 388 (2d Cir. 2004) (suggesting procedure and time limits to ensure speedy disposition of Social Security cases following remand by a district court). "[I]f these deadlines are not observed, a calculation of benefits owed [to plaintiff, Raul Rosales Bonilla] must be made immediately." *Id*.

SO ORDERED.

DATED:      Brooklyn, New York
            September 20, 2007

                        _____/s/_____
                            DORA L. IRIZARRY
                         United States District Judge